Paul M. Fakler (*Admitted Pro Hac Vice*)
Ross J. Charap (*Admitted Pro Hac Vice*)
Eric Roman (*Admitted Pro Hac Vice*)
ARENT FOX LLP
1675 Broadway
New York, NY 10019
Telephone:  212. 484.3900
Facsimile:   212.484.3990
E-mail:       fakler.paul@arentfox.com
E-mail:       charap.ross@arentfox.com
E-mail:       roman.eric@arentfox.com

Michael L. Turrill (CA Bar No. 185263)
Jeffrey R. Makin (CA Bar No. 252426)
ARENT FOX LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Telephone:  213.629.7400
Facsimile:   213.629.7401
E-mail:       turrill.michael@arentfox.com
E-mail:       makin.jeffrey@arentfox.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Peermusic, III, Ltd., et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>LiveUniverse, Inc., et al.,<br><br>                    Defendants. | Case No.  CV 09-6160-GW (PLAx)<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR FINAL DEFAULT JUDGMENT**<br><br>**[Declarations of Paul M. Fakler and Darryl Ballantyne filed concurrently herewith]**<br><br>Hearing<br>Date:   October 24, 2011<br>Time:   8:30 a.m.<br>Place:  Courtroom 10<br>            The Hon. George H. Wu |

# TABLE OF CONTENTS

I. PLAINTIFFS ARE ENTITLED TO JUDGMENT ON 528 INFRINGED WORKS ......... 1

II. THE COURT SHOULD NOT SET THE AMOUNT OF STATUTORY DAMAGES BASED UPON A RELATIONSHIP TO COMPENSATORY DAMAGES ................................................................................................ 3

III. IF THE COURT CONSIDERS COMPENSATORY DAMAGES IN CONNECTION WITH STATUTORY DAMAGES, THE STATUTORY AWARD SHOULD BE DETERMINED IN RELATION TO DEFENDANTS' PROFITS, NOT HYPOTHETICAL LICENSE FEES ........................................ 5

    A. The Measure Of Compensatory Damages In This Case Would Be Defendants' Profits, Not A Reasonable Royalty Fee ............................. 5

    B. Under The Facts Of This Case, $50,000 Per Work, Amounting To Approximately Three Times The Available Compensatory Damages, Would Be A Reasonable Statutory Damage Award ............................. 10

IV. ATTORNEYS' FEES AND COSTS ...................................................... 12

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Capitol Records, Inc. v. Thomas,*
   579 F. Supp.2d 1210 (D. Minn. 2008) .......................................................... 4

*D.C. Comics, Inc. v. Bobtron Int'l, Inc.,*
   No. 89 Civ. 4358 (MBM), 1990 WL 106771 (S.D.N.Y. July 25, 1990) ............... 10

*Davis v. The Gap, Inc,*
   246 F.3d 152 (2d Cir. 2001) ................................................................. 7, 8, 9

*F.W. Woolworth Co. v. Contemporary Arts, Inc.,*
   344 U.S. 228 (1952) .............................................................................. 5, 8

*Infotext, Inc. v. Liberty Financial Credit,*
   243 F.3d 548, 2000 WL 1782753 ............................................................... 7, 8

*Johnson v. Jones,*
   149 F.3d 494 (6th Cir. 1998) ....................................................................... 8

*New Form, Inc. v. Tekila Films, Inc.,*
   357 Fed. Appx. 10 (9th Cir. 2009) ............................................................... 4

*Peer Int'l Corp. v. Pausa Records, Inc.*
   909 F.3d 1332 (9th Cir. 1990) ............................................................... 4, 11

*Polar Bear Productions, Inc. v. Timex Corp.,*
   384 F.3d 700 (9th Cir. 2004) ....................................................................... 8

*Sony BMG Music Entertainment v. Tennenbaum,*
   Nos. 10–1883, 10–1947 ............................................................................. 5

*Stenograph L.L.C. v. Bossard Associates, Inc.,*
   144 F.3d 96 (D.C. Cir. 1998) ....................................................................... 8

STATUTES

17 U.S.C. § 504 .......................................................................................... 4, 6, 8

Plaintiffs respectfully submit this Supplemental Memorandum, as directed by the Court, to address various issues raised by the Court at its September 26, 2011 hearing (the "Hearing") of Plaintiffs' Motion for Final Default Judgment (ECF No. 211, the "FDJ Motion"), and in the Tentative Ruling (ECF No. 212) distributed at the Hearing.

## I.  Plaintiffs Are Entitled To Judgment On 528 Infringed Works

In its Tentative Ruling, the Court indicated that it believed that Plaintiffs were relying solely upon the songs identified in Plaintiffs' Complaint For Copyright Infringement (ECF No. 1, the "Complaint") to establish statutory damages, and noted that 463 infringed songs had been specifically identified in the attachments to the Complaint. Tentative Ruling at 8. Plaintiffs respectfully submit that their recovery is not limited to the songs specifically identified in the Complaint. Plaintiffs are basing their request for damages upon the infringements identified to the Court and to Defendants during the preliminary injunction phase of this proceeding. FDJ Motion p. 6. Recognizing that the various references to the Complaint, for the purposes of default judgment, and the additional evidence supporting damages in the FDJ Motion may be somewhat confusing, Plaintiffs appreciate the opportunity to clarify their claims.

Plaintiffs submitted two sets of documents to establish the number of infringements for which they seek damages. The first set comprises one declaration from each affiliated group of Plaintiffs, establishing registration and ownership chain of title for a representative sample of songs infringed by Defendants. The second set of documents comprises the notices of infringement served upon Defendants during the preliminary injunction phase of this proceeding, and upon which various of the Court's contempt rulings were based. These notices are attached to the Declaration of Paul Fakler in Support of Plaintiff's FDJ Motion

(ECF No. 211-1, the "Fakler FDJ Decl."), as Exhibits 11-13.

The Andrade Declaration[1] provides evidence of copyright registration and ownership for 192 infringed songs owned by the Peermusic Plaintiffs. Andrade Decl. ¶¶ 12-203. Each of these 192 songs may be found in Exhibit 11 to the Fakler FDJ Decl., which consists of various notices of infringement served by the Peermusic Plaintiffs on Defendants in this case and, for each song, establishes that at least one of Defendants' infringing websites copied and displayed the song without license during the period of infringement. Fakler FDJ Decl., Ex. 11.

Similarly, the Burnett Declaration[2] provides evidence of copyright registration and ownership for 140 infringed songs owned by the Warner/Chappell Plaintiffs. Burnett Decl. ¶¶ 12-151. Each of these 140 songs may be found in Exhibit 12 to the Fakler Declaration, which consists of various notices of infringement served by the Warner/Chappell Plaintiffs on Defendants in this case and, for each song, establishes that at least one of Defendants' infringing websites copied and displayed the song without license during the period of infringement. Fakler FDJ Decl., Ex. 12.

Finally, the Montiel Declaration[3] provides evidence of copyright registration and ownership for 196 infringed songs owned by the Bug Music Plaintiffs. Montiel Decl. ¶¶ 12-207. Each of these 196 songs may be found in Exhibit 13 to the Fakler Declaration, which consists of various notices of infringement served by the Bug

---

[1] The Declaration of Elias Andrade On Behalf of Peermusic III, Ltd., Songs of Peer Ltd., Peer International Corp., Peermusic Ltd., PSO, Ltd., and Southern Music Publishing Co., Inc. (collectively "Peermusic") In Support of Plaintiffs' FDJ Motion (ECF No. 211-8, the "Andrade Decl.").

[2] The Declaration of Kelly Burnett On Behalf of WB Music Corp., Warner-Tamerlane Publishing Corp. and Unichappell Music, Inc. (collectively "Warner/Chappell") In Support of Plaintiffs' FDJ Motion (ECF No. 211-6, the "Burnett Decl.").

[3] The Declaration of Jean Montiel On Behalf of Bug Music, Inc., Windswept Holdings LLC and Hitco Music Publishing, LLC (collectively, "Bug Music") In Support of Plaintiffs' FDJ Motion (ECF No. 211-7, the "Montiel Decl.").

Music Plaintiffs on Defendants in this case and, for each song, establishes that at least one of Defendants' infringing websites copied and displayed the song without license during the period of infringement. Fakler FDJ Decl., Ex. 13.

Combining the 192 Peermusic songs with the 140 Warner/Chappell songs and the 196 Bug Music songs yields a total of 528 infringed songs for which Plaintiffs seek, and are entitled to, damages.

Notably, these 528 songs are a mere representative sample of the total number of Plaintiffs' songs that Defendants have infringed. Indeed, in their Complaint, Plaintiffs allege that Defendants have infringed hundreds of thousands of Plaintiffs' songs. Complaint ¶ 5. Plaintiffs made clear that the songs identified in the exhibits to the Complaint were merely representative samples, much like the songs identified in Plaintiffs' notices of infringement, and Plaintiffs' claims were not limited to the songs identified in those exhibits. Complaint ¶¶ 44, 53, 62, 71 ("Due to the massive scale of Defendants' . . . infringement, Exhibits 1-3 are non-exhaustive and include only a small fraction of Plaintiffs' Songs that were infringed. Plaintiffs reserve the right to seek relief for any other infringed songs that are discovered or identified at any time prior to trial."). Defendants prevented Plaintiffs from establishing the total number of infringements by refusing to provide requested discovery on this point. Supplemental Declaration of Paul M. Fakler in Further Support of Plaintiff's FDJ Motion (the "Supplemental Fakler Decl.") ¶ 4. For all of these reasons, Plaintiffs respectfully submit that their statutory damages award should be based upon 528 works, and that the Court should take into account that this number represents a small fraction of the hundreds of thousands of infringed songs alleged in the Complaint when setting the statutory damage award.

## II. The Court Should Not Set the Amount of Statutory Damages Based Upon a Relationship to Compensatory Damages

The Court has indicated that it intends to set the amount of statutory damages

based, at least in part, upon the amount Defendants would have paid if they had taken out licenses. Tentative Ruling at 9. At the Hearing, the Court asked Plaintiffs to provide the Court with the royalty rate typically paid by licensed lyric websites. Plaintiffs respectfully submit, however, that the Court's proposed approach would not be appropriate because the Ninth Circuit has expressly rejected the notion that there should be any required nexus between compensatory and statutory damages.

Plaintiffs acknowledge that some recent district court decisions in other jurisdictions have indicated, typically in peer-to-peer file sharing cases where the defendant was an individual non-commercial infringer who had not generated any revenues from the infringement, that it would be appropriate for those courts to consider the relationship between available compensatory damages and the statutory award. *See, e.g., Capitol Records, Inc. v. Thomas*, 579 F. Supp.2d 1210, 1227 (D. Minn. 2008). As a preliminary matter, such cases are clearly distinguishable because Defendants in this case generated millions of dollars of revenue from their infringing conduct. FDJ Motion pp. 10-11.

More important, however, the Ninth Circuit has repeatedly rejected this reasoning, and held (consistent with the statute, its legislative history and considerable precedent) that "[t]here is no required nexus between actual and statutory damages under 17 U.S.C. § 504(c)." *New Form, Inc. v. Tekila Films, Inc.*, 357 Fed. Appx. 10, 11-12 (9th Cir. 2009) (affirming district court's refusal to adopt proposed jury instruction directing jury to measure statutory damages in relation to compensatory damages and rejecting argument that statutory damage award far disproportionate to actual damages was improperly excessive). *See also, Peer Int'l Corp. v. Pausa Records, Inc.* 909 F.3d 1332, 1336-37 (9th Cir. 1990) (rejecting argument that maximum statutory damage award disproportionate to unpaid statutory license fees was improperly excessive, particularly in light of need to deter willful infringement). Indeed, the Supreme Court has held that any award within

the statutory range is allowable, even if there have been *no* lost revenues or infringer's profits, for the purpose of deterrence. *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952). Other Circuits have similarly rejected any required nexus between compensatory and statutory damages. *Sony BMG Music Entertainment v. Tennenbaum*, Nos. 10–1883, 10–1947, 10–2052, 2011 WL 4133920 at *17 (1st Cir. Sept. 16, 2011) (collecting other cases). Based upon this precedent, Plaintiffs respectfully submit that the Court should not base its statutory damage award on the available compensatory damages, but rather should base the award on the factors, including willfulness, refusal to provide discovery and deterrence, consistent with precedent. These factors were addressed in Plaintiffs' FDJ Motion and fully support an award of $100,000 per work. FDJ Motion pp. 27-30.

### III. If the Court Considers Compensatory Damages In Connection With Statutory Damages, the Statutory Award Should Be Determined In Relation to Defendants' Profits, Not Hypothetical License Fees

#### A. The Measure Of Compensatory Damages In This Case Would Be Defendants' Profits, Not A Reasonable Royalty Fee

If the Court were to depart from the precedent cited above and require some relationship between compensatory and statutory damages, Plaintiffs respectfully submit that a reasonable royalty fee would not be an appropriate measure upon which to base a statutory damage award, especially in this case. Indeed, if Plaintiffs were to elect compensatory damages instead of statutory damages, lost royalty fees would not even be at issue. Indeed, to the extent the Court were to assess statutory damages at an amount lower than Defendants' total revenues from the infringing websites, Plaintiffs would likely elect to recover those total revenues instead of statutory damages, as would be their right at any time up through final judgment.

Under the Copyright Act, a plaintiff may elect between compensatory or statutory damages. If the plaintiff elects compensatory damages, the measure of

damages is not limited solely to lost license fees suffered by the copyright owner. In such situations, Section 504 of the Copyright Act provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

Two relevant points flow from this statutory language, and the precedent construing it. First, even if there were a legal requirement that a statutory damage award must bear some relationship to the amount Plaintiffs could obtain under the compensatory damages provision of the Copyright Act, that provision requires that the Court assess not only Plaintiffs' lost profits (in this case measured by an unpaid, hypothetical license) but also Defendants' profits from their infringing conduct. Second, to establish Defendants' profits, Plaintiffs need only establish Defendants' gross revenue from the part of their business engaged in the infringing conduct. It is Defendants' burden, not Plaintiffs' burden, to prove any deductible expenses or apportion those gross revenues to account for non-infringing materials or conduct.

With respect to the first point, the Copyright Act clearly provides that a copyright owner is entitled to both its lost profits *and* the infringer's profits, so long as there is no double counting. *Id.* Of course, in this case any lost license fees would have been subsumed within, and less than, Defendants' profits because the license fee is typically payable at 50% of gross revenue. Ballantyne Decl. ¶ 6.

Indeed, use of a reasonable royalty measure of damages is a relatively recent development in Copyright Law and was developed for use in "indirect profits" cases where there was no evidence establishing a direct causal link between the infringement and the defendant's revenues.

The seminal case establishing reasonable royalty copyright damages is instructive. In *Davis v. The Gap, Inc.*, the Second Circuit endorsed this theory of damages for the first time in a copyright case. *Davis v. The Gap, Inc,*, 246 F.3d 152, 172 (2d Cir. 2001). In *Davis*, the infringing defendant had used a photograph of a person wearing the plaintiff's copyright-protected jewelry in an advertising campaign. *Id.* at 156. The plaintiff could not elect statutory damages because he had not timely registered his copyright. *Id.* at 158. In reviewing the district court's denial of compensatory damages, the Second Circuit noted that both lost sales and the infringer's profits are generally available. *Id.* at 159. The Second Circuit agreed with the district court that there was no evidence that the defendant's gross revenues from its entire business, including non-Gap stores, were attributable to the infringing advertisement, nor was there any evidence that the defendant had lost any sales of its jewelry. *Id.* at 159-161. Under these circumstances, and specifically for the purpose of not depriving the plaintiff of any meaningful monetary remedy in the absence of lost sales or profits, the appellate court reversed the district court and remanded for proceedings to determine a reasonable royalty, essentially as a proxy for the plaintiff's actual damages. *Id.* at 161-72.

As can be seen by review of the *Davis* decision, the reasonable royalty measure of damages has no applicability to this case because the Defendants' revenues from the infringing websites at issue are directly related to their infringement; this is not an indirect damages case. Plaintiffs' compensatory damage award in this case would be the amount of Defendants' profits, irrespective of what Defendants would have paid if they had obtained a license. A court's failure to award the infringer's profits constitutes reversible error. *Infotext, Inc. v.*

*Liberty Financial Credit*, 243 F.3d 548, 2000 WL 1782753 at **1-2 (9th Cir. Dec. 4, 2000). Thus, the baseline from which to judge the reasonableness of a statutory damage award (if such an evaluation were appropriate) would have to be Defendants' profits, not the lost license fee.

The statutory language is equally clear with respect to how Defendants' profits should be measured. Plaintiff's only burden to establish Defendants' profits would be to demonstrate Defendants' gross revenue reasonably related to the infringing conduct. 17 U.S.C. § 504(b); *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004). Once gross revenues are established, the burden shifts to the infringer to prove deductible expenses (if any) and whether any portion of the revenue was generated from non-infringing content or conduct. *Infotext, Inc.*, 243 F.3d 548, 2000 WL 1782753 at *2. If the infringer fails to affirmatively prove allowable deductions or apportionment, the copyright owner is entitled to the infringer's gross profits, without any deduction or apportionment. *F.W. Woolworth Co.*, 344 U.S. at 230; *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998); *Stenograph L.L.C. v. Bossard Associates, Inc.*, 144 F.3d 96, 103 (D.C. Cir. 1998). As the Ninth Circuit has held, "[a]ny doubt as to the correctness of the profit calculation should therefore be resolved in favor of the plaintiff." *Infotext, Inc.*, 243 F.3d 548, 2000 WL 1782753 at *2 (quoting *Eales v. Environmental Lifestyles, Inc.*, 958 F.2d 876, 881 (9th Cir. 1992)).

In this case, the relevant gross revenue is Defendants' gross revenue from the infringing websites. *C.f. Davis*, 246 F.3d at 160. The Second Circuit's analysis is directly on point:

> Thus, if a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of

- 8 -

> titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume.

*Id.*

Defendants refused to produce the full discovery necessary to establish the exact total amount of their revenue from the infringing websites. Nonetheless, Plaintiffs were able to extrapolate from the few months of revenue data produced by Defendants, and various testimony establishing that revenue from the infringing websites never decreased, and provide a reasonable estimate that Defendants received approximately $8 to $10 million dollars in revenue from the infringing websites alone during the four-year period of infringement. FDJ Motion pp. 10-11.

Defendants have not disputed this amount, and have not proven any allowable deductions. Nor have they met their burden of proving what portion of the revenue was attributable to non-infringing content (or even infringing content owned by other music publishers). Indeed, although Defendants claimed to have obtained lyric licenses from two major music publishers, the evidence shows that both licenses were quickly terminated because Defendants failed to pay the advances required by the license agreements or otherwise comply with important accounting requirements. Fakler Decl., Ex. A [Schuh Tr.] at 61:20-62:21; and 70:25-71:21; 74:5-76:18. Consequently, other than for a very short time during the overall period of infringement, every single song on Defendants' websites was infringing content.

Defendants' failure to meet their burden to prove deductions or the amount of gross revenue attributable to content other than Plaintiffs' songs does not somehow shift Defendants' burden onto Plaintiffs. Particularly in light of Defendants' egregious discovery misconduct, it would be grossly unfair for the Court to reduce Plaintiffs' damage award due either to an inability to demonstrate the exact amount of Defendants' profits (especially when statutory damages may be awarded without proof of any actual damages or profits), or worse, due to an estimate of expenses or apportionment for which Defendants have provided no proof or discovery.

B.   Under The Facts Of This Case, $50,000 Per Work, Amounting To Approximately Three Times The Available Compensatory Damages, Would Be A Reasonable Statutory Damage Award

As demonstrated above, the reasonableness of a statutory damage award in this case should be judged based upon Defendants' gross revenue from the infringing websites of $8 to $10 million. Moreover, in order to satisfy the statutory policies of specific and general deterrence, the award must be a multiple of Defendants' gross revenue. *See, e.g., D.C. Comics, Inc. v. Bobtron Int'l, Inc.*, No. 89 Civ. 4358 (MBM), 1990 WL 106771 at *2 (S.D.N.Y. July 25, 1990) (setting statutory damage award at three times profits to satisfy policies of general and specific deterrence of willful infringement). In this case, the evidence of Defendants' willfulness and malice is overwhelming, and goes far beyond the evidence of post-suit willfulness cited in the Tentative Ruling. Plaintiffs submitted testimony and documents from various sources, all proving beyond any doubt that Defendants were repeatedly and specifically warned by several attorneys, including their own in-house and outside counsel, that their operation of the lyric websites without licenses was infringing music publishers' copyrights. FDJ Motion at 7-10.

If the Court bases its award on any figure less than Defendants' total revenue from the infringing websites, for example, based upon some unknown and unproven (and not knowable or provable, due to Defendants' own refusal to provide

discovery) percentage of infringing lyrics that are not owned by Plaintiffs, the end result will be that Defendants will have been allowed to profit from their massive willful infringement. Indeed, under this reasoning Defendants would be allowed to profit from their infringement unless every single one of the thousands of music publishers owning songs infringed on Defendants' websites went through the burdensome process of suing Defendants. Such a result would be wholly inconsistent with the purposes and policies of statutory damages under the Copyright Act, particularly because it would wholly fail to provide any specific or general deterrent effect. *Peer Int'l Corp.*, 909 F.2d at 1337 (quoting *F.W. Woolworth Co.*, 344 U.S. at 233).

One final point relating to deterrence: as the Ballantyne Declaration notes, there are thousands of unlicensed lyric sites. Ballantyne Decl. ¶¶ 7-8. However, each time this Court granted relief to the Plaintiffs (e.g. entering the Preliminary Injunction and taking down Defendants' sites) many sites entered into licenses and many others simply shut down. *Id.*, ¶ 8. A large statutory damage award amounting to a multiple of Defendants' total profits would not only be appropriate, it will persuade many of the remaining unlicensed sites to obey the law by obtaining licenses or shutting down. *Id.* Conversely, a lesser damage award could serve to embolden the already infringing sites who flout the law and encourage others to enter the market without licenses. *Id.*

In its Tentative Ruling, the Court agreed that setting an award below the enhanced damage threshold of $30,000 per work is inappropriate in this case because of Defendants' knowing and willful infringement. Tentative Ruling at 8. If the Court were to award $30,000 per work, the total award would be $15,840,000, which is less than double Defendants' profit from the infringing websites. If the Court is not inclined to award Plaintiffs the requested (and fully justified) $100,000 per work, Plaintiffs request that the Court award at least $50,000 per work. That award would total $26.4 million, which is approximately

three times the amount Plaintiffs would be entitled to under the compensatory damages provision of the Copyright Act.

### IV. Attorneys' Fees and Costs

At the Hearing, the Court inquired as to the approximate amount of costs and attorneys' fees Plaintiffs have incurred in prosecuting this case. As the Court may recall, this case has been pending for over 24 months (and Plaintiffs spent months preparing for suit). During that period, because of Defendants' misconduct, delaying tactics and total lack of cooperation, Plaintiffs have been forced to file numerous motions, including discovery motions, a preliminary injunction motion, opposition to a frivolous summary judgment motion, and multiple contempt motions against Defendants. Supplemental Fakler Decl. ¶ 4. Indeed, there are 212 entries on the docket for this case. *Id.* Due almost entirely to Defendants' misconduct and refusal to obey the Court's various orders, Plaintiffs have incurred just over $1 million in attorneys' fees and just over $66 thousand in costs to date. *Id.*

Dated: October 14, 2011    ARENT FOX LLP

By: s/ Jeffrey R. Makin
    Paul M. Fakler (*Admitted Pro Hac Vice*)
    Ross J. Charap (*Admitted Pro Hac Vice*)
    Eric Roman (*Admitted Pro Hac Vice*)
    Michael L. Turrill
    Jeffrey R. Makin

Attorneys for Plaintiffs
Peermusic, III, Ltd., et al.